# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CHERYL & CO.,**

    **Plaintiff,**

  v.                                        Civil Action 2:18-cv-1485
                                                Chief Judge Edmund A. Sargus, Jr.
                                                Magistrate Judge Jolson

**CHERYL L. KRUEGER, et al.,**

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the following: (1) Plaintiff's request to appoint its Product Development Manager, Brenda Mortenson to review Defendant's confidential recipes, (Docs. 56, 57); and (2) Plaintiff's Motion for Leave to File Notice of Supplemental Evidence (Doc. 60). The Court finds that, on balance, the use of an independent, rather than in-house, consultant strikes the proper balance between allowing the parties to engage in discovery while also protecting their respective business interests. In addition, Plaintiff's Motion for Leave to File Supplemental Evidence is **GRANTED**. (Doc. 60).

## I.   BACKGROUND

Plaintiff Cheryl & Co. ("Cheryl's"), founded in 1981, by Defendant Cheryl L. Krueger, is a leading seller of cookies and other baked goods. It is most well-known for its buttercream frosted cookies, pictured below:



(Doc. 1 at 5). Defendant Krueger sold her company in 2005 for $40 million. (*Id*., ¶ 12). According to the Complaint, she recently formed a competing cookie company, CKE Management, LLC ("CKE"), that allegedly sells "lookalike cookies using the same secret recipes, branding, and techniques" as Cheryl's. (Doc. 1, ¶ 17). An example of CKE's alleged "knock-off branding and desserts" is provided below.



(*Id*. at 6). But Cheryl's accuses CKE of more than selling "lookalike" cookies. It also alleges that CKE "pirated" from it "at least four senior executives"—Defendants David Adell, Amy Coley, T. David Dalton and Elisabeth Allwein. (*Id*., ¶ 17). Cheryl's alleges that CKE hired these executives to "unfairly compete" against it and to solicit Cheryl's business accounts. (*Id*.).

2

Discovery in this matter is ongoing—a process which has required the Court's attention frequently. Currently, the parties disagree about who should review the other's secret recipes. Cheryl's seeks to designate its Product Development Manager, Brenda Mortenson, as an expert witness to "opine about the similarities between and derivations from the recipes and baking processes for certain cookies" made by the respective parties. (Doc. 57 at 1). Cheryl's suggests that CKE, in turn, may designate its own product development director, Elisabeth Allwein, to do the same. (*Id.*).

As noted, Ms. Allwein is a Defendant in this case and is one of the four "senior executives" who switched teams from Cheryl's to CKE. (Doc. 1, ¶ 17). Ms. Allwein began working at Cheryl's in 1993 and, until early 2018, served as its Director of Product Development. (Doc. 1, ¶ 92). Ms. Mortenson has since filled this position at Cheryl's. (Doc. 57 at 1). Individuals in this role have access to Cheryl's "top-secret" recipes and approve new flavors and products. (*Id.*, ¶ 93). Cheryl's accuses Ms. Allwein of misusing or threatening to misuse these trade secrets to CKE's competitive advantage. (*Id.*, ¶ 132). Given Ms. Allwein's and Ms. Mortenson's expertise, Cheryl's believes that they are the perfect candidates to review the recipes at issue and opine on their similarities. (Doc. 57 at 1). CKE, however, asserts that only an independent expert, one who is not affiliated with either company, should be permitted to review its secret recipes. (*See generally* Doc. 56).

The Undersigned held a status conference with the parties to discuss this matter, among other things, on June 17, 2019. (Doc. 49). In accordance with the Court's directive, the parties filed supplemental letter briefs on June 27, 2019. (*See* Docs. 56, 57). That same day, the parties submitted the confidential recipes at issue to the Court for *in camera* review. Cheryl's has also

moved to file supplemental exhibits, (Doc. 60), which the Court has thoroughly reviewed as part of its decision. Accordingly, this matter is now ripe for resolution.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure permit a Court to order that "a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed. R. Civ. P. 26(c)(7). There is however, no absolute bar to the discovery of trade secrets. *See Barry Fiala, Inc. v. Stored Value Sys.*, No. 02-2248 MA/AN, 2005 WL 8157408, at *2 (W.D. Tenn. Feb. 9, 2005). Rather, "courts must exercise discretion to avoid unnecessary disclosure of such information." *Id.* (citation and quotation marks omitted); *see also R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 269 (6th Cir. 2010) (noting that "[i]t is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure") (citation and quotation marks omitted). Accordingly, it is the court's job to "consider imposing special conditions when a trade secret is disclosed during discovery." *Id.*

## III. DISCUSSION

Essentially, this dispute boils down to the parties' contrasting views regarding the consequences of disclosing trade secrets to a competitor as part of the discovery process. For its part, CKE believes it should not be forced to disclose its confidential recipes to Ms. Mortenson, Cheryl's Product Development Manager, for fear that she will inevitably use this information to the competitive advantage of Cheryl's. (*See generally* Doc. 56). Cheryl's, however, views this risk as a non-issue, asserting that parties to litigation routinely rely on in-house experts for consultation and cost-saving purposes and that the parties' protective order minimizes any risk of improper use. (*See generally* Doc. 57). Good intentions aside, CKE argues it is impossible for

Ms. Mortenson to "mentally sequester" CKE's confidential recipes, and her knowledge of the recipes will eventually permeate her decisions made on behalf of Cheryl's, ultimately harming the business interests of CKE. (Doc. 56 at 1).

Regardless of the practical concerns, Cheryl's posits that "no legal authority" exists to support CKE's position. (Doc. 57 at 3). The Court concludes otherwise. CKE's concern is one that frequently arises in infringement cases. Often in these cases, one party seeks disclosure of the other party's trade secrets to its in-house counsel. Despite this factual distinction, the overarching question from these cases is equally present here: Whether the risk of disclosure of trade secrets to a competitor is outweighed by a party's need for the information. Two cases have emerged as the leading authority in this area: *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), and *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992). The principles from these cases guide the Court here. *See, e.g.*, *Parker Compound Bows, Inc. v. Hunter's Mfg. Co., Inc.*, No. 5:14CV4, 2014 WL 12462305, at *3 (W.D. Va. Dec. 8, 2014) (applying these principles where disclosure would be made to key employees rather than in-house counsel); *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 299 F.R.D. 498, 500 (W.D. Va. 2014) (same).

When deciding whether to permit disclosure of trade secrets to a party's competitor, courts apply a two-pronged test. (the "*U.S. Steel* and *Brown Bag* test"). First, the court must determine whether disclosure would be made to a "competitive decision maker," *see U.S. Steel*, 730 F.2d at 1468, and second, courts balance the risk of disclosure against the party's need for the information, *see Brown Bag Software*, 960 F.2d at 1471. This test is well established. *See, e.g.*, *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1380 (Fed. Cir. 2010) (describing two-step test under *U.S. Steel* and *Brown Bag*); *Nevro Corp. v. Bos. Sci. Corp.*, No. 16-CV-06830-VC (MEJ), 2017 WL 2780719, at *2–3 (N.D. Cal. June 27, 2017) (finding that disclosure would be made to a

competitive decision-maker and that on balance, the party's need for in-house counsel to review the confidential information did not outweigh the risk of disclosure) (citing *U.S. Steel*, 730 F.2d at 1468 n.3; *Brown Bag*, 960 F.2d at 1470–71); *Cheah IP LLC v. Plaxo, Inc.*, No. C-08-4872 PJH (EMC), 2009 WL 1190331, at *1 (N.D. Cal. May 4, 2009) (explaining that the case turned on (1) whether disclosure would be made to competitive decision-makers; and (2) the respective risks to the parties should the information be disclosed to a competitive decision-maker). Further, courts generally apply this test on a sliding scale: if disclosure is made to a competitive decision-maker "the risk of disclosure may outweigh the need for confidential information." *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (citing *U.S. Steel*, 730 F.2d at 1468).

### A. Competitive Decision-Maker and Risk of Disclosure

At base, the "primary concern" behind the competitive decision-making test is that confidential information will be used or inadvertently disclosed because of the employee's "role in the client's business decisions." *U.S. v. AB Electrolux*, 139 F. Supp. 3d 390, 392 (D.D.C. 2015). So, courts consider the fact-specific inquiry of the employee's involvement "in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel*, 730 F.2d at 1468 n3. Particular attention should be paid to an employee's involvement in the following company decisions: pricing, marketing, product design, selection of vendors, purchasing, or "overall corporate strategic decision making." *See Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 58 (D.D.C. 2007) (finding in-house counsel was not a competitive decision-maker because her responsibilities were "exclusively either legal, administrative, or organizational"); *see also DSM Desotech, Inc. v. Momentive Specialty Chemicals, Inc.*, No. 2:15-CV-70, 2016 WL 8193590, at *7 (S.D. Ohio May 31, 2016) (finding in-house counsel was competitive decision-maker, noting his membership on management team, role

in evaluating patent portfolios, and preparation of a recommendation to business units relating to cutting costs).

Here, the Court finds that Ms. Allwein and Ms. Mortenson are undoubtedly competitive decision-makers for their respective employers. The parties could not argue otherwise. Indeed, in its Complaint, Cheryl's describes the critical role of its product development director. (Doc. 1, ¶ 93). As Cheryl's product development director until early 2018, Ms. Allwein "was one of only a few employees that had access to all of Cheryl's top-secret baking recipes, and no new flavors or products could be marketed or sold without her approval." (*Id*.). Ms. Mortenson now fills this position at Cheryl's. (Doc. 57 at 1). And, during her deposition, Ms. Allwein testified that she "cannot think of anyone who is more knowledgeable about the development of Cheryl's recipes than she and Ms. Mortenson." (Doc. 60-2 at 4).

While Cheryl's believes that Ms. Allwein's and Ms. Mortenson's superior knowledge and valuable roles at their respective companies make them ideal recipe consultants, the Court finds that the opposite is true. Cheryl's characterizes CKE as its "direct competitor." (Doc. 1, ¶ 133). Under these circumstances, "the risk of inadvertent disclosure is obviously higher." *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 408 (N.D. Ill. 2006). Accordingly, the Court finds that, given their respective positions within the companies, there exists an "unacceptable opportunity for inadvertent disclosure." *U.S. Steel*, 730 F.2d at 1468; *see e.g.*, *Wanke Cascade Distrib Ltd v. Forbo Flooring, Inc.*, No. 3:13-CV-768-AC, 2014 WL 12648465, at *2 (D. Or. Apr. 11, 2014) (finding competitive decision-maker was responsible for making decisions on areas of its employer's business that "overlap" similar areas of competitor's business and that are contained within competitor's confidential information); *Intervet, Inc*., 241 F.R.D. at 57 (explaining that *U.S. Steel* "would preclude access" to information to anyone who

7

was "positioned" to advise the business on decisions "regarding, for example, pricing, marketing, or design issues when that party granted access has seen how a competitor has made those decisions.").

At bottom, the heart and soul of these companies is the development of their cookie recipes—a task for which Ms. Allwein and Ms. Mortenson are each largely responsible. And, as such, the Court easily concludes that they are both competitive decision-makers, each having an "unacceptable opportunity for inadvertent disclosure." *U.S. Steel*, 730 F.2d at 1468.

### B. Balancing Test

Having found a significant risk of harm, the Court must now weigh that risk of harm against Cheryl's stated need for the disclosure, considering the potential harm Cheryl's would face if it could not use Ms. Mortenson as its recipe consultant. *See In re Deutsche Bank Tr. Co. Americas*, 605 F.3d at 1380 (explaining that "[e]ven if a district court is satisfied that such a risk [of inadvertent disclosure or competitive use] exists, the district court must balance this risk against the potential harm to the opposing party"). The scales making up this balancing test do not always start out equally. Indeed, where disclosure would be made to a competitive decision-maker, like in this case, there is a presumption that disclosure is harmful. *See Am. Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 741 (Fed. Cir. 1987) (noting that courts have "presumed" that disclosure to a competitor is harmful); *see also Intel Corp.*, 198 F.R.D. at 529 (where disclosure is made to competitive decision-maker, "the risk of disclosure may outweigh the need for confidential information"). To rebut this presumption of harm, a court must find that, on balance, preventing disclosure would result in an "undue or unacceptable hardship." *See McAirlaids*, 299 F.R.D. 498 at 501.

The court's analysis in *McAirlaids* is useful here. There, the plaintiff sought to modify the parties' protective order to allow each party to "designate two competitive decision-makers within the company as 'technical advisors,'" who would have access to trade secrets. *Id*. at. 499. The plaintiff asserted that it was necessary to have in-house advisors "to make an educated business decision with regard to this litigation." *Id*. at 500. But, because the defendant sought to disclose confidential information "directly to its competitive decision-makers," the court was confronted with "exactly the unacceptable opportunity for inadvertent disclosure warned against in *U.S. Steel*." *Id*. at 501. On balance, the court found that the plaintiff's inability to use in-house technical advisors did "not create an undue or unacceptable hardship . . . significant enough to overcome the risk of disclosure[.]" *Id*. Instead, the court instructed the plaintiff to "assess the merits of the litigation and develop strategy using litigation counsel and outside experts to review information marked confidential or attorney eyes only[.]" *Id*. This outcome, according to the court, was "a necessary consequence of achieving a balance between full disclosure in discovery and protection against economic injury." *Id*.

The same is true here. Cheryl's states that it needs Ms. Mortenson to review the recipes because the cookie market is "highly specialized" and that "[a]n outside expert cannot know the intricate details of the creation, testing, development, and baking of the cookies involved in this case as well as they do," and because the use of an outside expert would drive up costs. (Doc. 57 at 3). But, like the plaintiff in *McAirlaids*, the parties here may use a qualified independent consultant to review the recipes at issue and assist with discovery. The Court does not find that this compromise creates an undue hardship significant enough to overcome the risk of disclosure in this case. *See, e.g.*, *id*.; *Parker Compound Bows, Inc.*, 2014 WL 12462305, at *3 (finding that the party's need to disclose to competitive decision-makers to evaluate its position in litigation did

9

"not outweigh the risk of harm" that "could result through inadvertent disclosure of its confidential information"); *Brown Bag*, 960 F.2d at 1471–72 (finding that plaintiff failed to demonstrate prejudice because its concerns were too speculative" and because it had "never attempted" to employ an independent consultant to review the confidential materials).

Cheryl's further suggests that the parties' protective order and Ms. Mortenson's good faith intentions minimize any potential harm. (*See* Doc. 57 at 2–3). Courts have rejected these arguments because it is impossible for someone to "'lock-up trade secrets in [her] mind.'" *Intel Corp.*, 198 F.R.D. at 530–31) (quoting *Brown Bag*, 960 F.2d at 1471); *see, e.g.*, *McAirlaids*, 299 F.R.D. at 501 (rejecting argument that misuse of trade secrets would be "minimized" under the terms of the protective order, explaining that, "there are circumstances where 'even the most rigorous efforts of the recipient of such information to preserve confidentiality' may not prevent inadvertent disclosure.") (quoting *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d at 1373). To borrow from the court in *McAirlaids*, the Court cannot expect Ms. Allwein and Ms. Mortenson to "separate their own thoughts and ideas from their own competitors' thoughts and ideas in all future endeavors," because despite their good intentions, "they are still subject to human fallibilities." 299 F.R.D. at 501.

In these circumstances, the Court has broad discretion to "fashion safeguards" that protect a party's "business interests," while at the same time "permitting the discovery of relevant evidence." *R.C. Olmstead, Inc. v. CU Interface LLC*, No. 5:08 CV 234, 2008 WL 11381824, at *5 (N.D. Ohio Aug. 14, 2008) (finding that "[w]hile [the plaintiff] may believe that its principal employees are in the best position to evaluate [the defendant's project]," the best way to protect trade secrets while allowing discovery is to limit review to experts and counsel). With these

competing interests in mind, the Court in its discretion, finds that the use of an independent consultant achieves the most just and reasonable balance.

## IV. CONCLUSION

For the foregoing reasons, Cheryl's request to use in-house consultants to review the secret recipes is **DENIED**. Further, Cheryl's Motion for Leave to file Supplemental Evidence (Doc. 60) is **GRANTED**.

Given this ruling, the parties have two choices: They either may elect to use one independent consultant and share the cost, or they may elect to each use their own independent consultant. The parties are **DIRECTED** to meet and confer and inform the Court within 14 days of the date of this Order which option they intend to pursue.

IT IS SO ORDERED.


Date: July 25, 2019  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE