# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CHERYL & CO.,**

          **Plaintiff,**

            **v.**

**CHERYL L. KRUEGER,** *et al.*,

          **Defendants.**

**Case No. 2:18-cv-1485**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Plaintiff Cheryl & Co.'s Motion for Summary Judgment (ECF No. 122) and Defendants Cheryl L. Krueger, CKE Management, LLC, David Adell, and Amy Coley-Tonti's Motion for Summary Judgment (ECF No. 123). For the following reasons, the Court **GRANTS in part**, **DENIES in part,** and **DENIES AS MOOT in part** both motions.

### I. BACKGROUND

This case is a dispute between two companies known for their gourmet cookies: Plaintiff Cheryl & Co. (known as Cheryl's Cookies) and Defendant CKE Management (known as C.Krueger's Finest Baked Goods). Both companies are based in central Ohio. Both companies were started by Defendant Cheryl Krueger. Krueger founded Cheryl & Co. in 1981, sold the business in 2005, left the business in 2009, and founded CKE Management in 2017. In 2018, several long-time employees of Cheryl & Co. who had worked under Krueger left to work for CKE. CKE began selling cookies in the fall of 2018. This litigation ensued.

### A. The Companies

#### 1. Plaintiff Cheryl & Co. — Cheryl's Cookies

Defendant Cheryl Krueger founded Plaintiff Cheryl & Co., widely known as Cheryl's Cookies, in 1981. (Krueger Dep. 26:7–10, 305:6–12.) After building Cheryl & Co. into a successful business, Krueger sold the company for roughly $42 million to 1-800-Flowers in 2005. (*Id.*) Krueger remained as President of Cheryl & Co. until 2009 when she departed the company. (Krueger Decl. ¶ 2.) Cheryl & Co. sells gourmet frosted and unfrosted cookies, brownies, and other baked goods. Cheryl & Co. maintains several stores in central and western Ohio and sells its products throughout the United States via its online store and other websites under the 1-800-Flowers umbrella. (LaFollette Decl. ¶ 4.)

#### 2. Defendant CKE Management — C.Krueger's Finest Baked Goods

After eight years away from the cookie business, Krueger co-founded two companies in the fall of 2017: Defendant CKE Management, LLC ("CKE") and GourMED, LLC ("GourMED"). (*Id.* ¶ 4.) Krueger and her partners' venture initially focused on Ohio's budding medical marijuana industry. (*Id.* ¶ 4.) GourMED was to sell marijuana-infused baked goods, such as brownies and cookies. (*Id.*) GourMED needed dispensary and processor licenses from the State of Ohio to produce and sell marijuana before it could open. (*Id.* ¶ 5.) GourMED applied for these licenses. (*Id.*) But, "because there was no guarantee as to when the State of Ohio would decide" whether to award GourMED the licenses, the parties also formed CKE to hedge their investment. (*Id.*) CKE would sell non-marijuana baked goods to generate cash and offset expenses while GourMED awaited a licensing decision from the State. (*Id.*) If successful, GourMED and CKE would share employees and facilities. (Avery Dep. 49:5–17.) GourMED's applications to market medical

marijuana were not successful. So in 2018, Krueger's focus shifted to CKE, the non-marijuana baked goods business, to generate revenue. (*Id.*; Krueger Dep. 329:2–22.)

In October of 2018, CKE—which does business as C.Krueger's Finest Baked Goods—opened its first store in central Ohio and started selling cookies in-store and on its website. (Krueger Dep. 233:17–234:17, Ex. 136; Krueger Decl. ¶ 6.) Like Cheryl & Co., CKE sells gourmet frosted and unfrosted cookies, brownies, and other baked goods. (*Id.* at 282:3–283:2.) Both companies prominently feature baked cookies with a similar frosted "swirl." (*Id.* at 142: 5–17.) Unlike Cheryl & Co., CKE does not sell its cookies through paid television programming and does not do business through wholesale clubs, such as Costco. (Krueger Decl. ¶¶ 7–8.) CKE sells larger cookies, uses different recipes, and sells its cookies at a higher price point than Cheryl & Co. (*Id.*) CKE also allows customers to frost their own cookies at its retail store and pair the cookies with options from a milk bar. (*Id.* ¶9.)

Cheryl & Co. and CKE are competitors. (Kruger Dep. 282:3–5.) After CKE opened for business, five of Cheryl & Co.'s larger corporate customers stopped placing orders with Cheryl & Co. and began ordering from CKE. (*See* Mead Decl., Ex. K, Expert Report of Stephen Buffo ¶¶ 38–67.)

## B. The Employees

After starting CKE and GourMED, Krueger hired Defendants Amy Tonti, Defendant David Adell, Elisabeth Allwein, and Cindy Dalton. (*Id.* at 61:7–8.) At the time of hiring by Krueger, all four were employed with Cheryl & Co and had worked at Cheryl & Co. when Krueger ran the company. (*Id.* at 60:24–65:10; Tonti Dep. 51:15–18; Krueger Dep. 322:14.)

### 1. Defendant Amy Tonti

Amy Tonti started working for Cheryl & Co. in 2001. (Tonti Dep. 51:15–18.) In 2010, Tonti was promoted to Cheryl & Co.'s Director of Sourcing and Inventory Management. (*Id.* at 36:3–7.) In this role, Tonti oversaw the purchasing of raw materials for Cheryl & Co.'s cookies and brownies. (*Id.* at 171:13–16.) This job required her to make recommendations to the food production team about which product volumes should be "increased, maintained, or phased out, and when" based on her knowledge of Cheryl & Co.'s "products, budget, financial information, and trends in the cookie industry[.]" (LaFollette Decl. ¶ 8.) Tonti also worked in other roles for Cheryl & Co.'s parent company, 1-800-Flowers. (Tonti Dep. 72:4–9.) In 2011, Tonti signed a "Confidentiality and Non-Compete Agreement" with Cheryl & Co. as consideration for continued employment. (Tonti Dep at 12:2–12, Ex. 71.)

Tonti was actively looking for new employment opportunities in 2017. (*Id.* at 70:2–6.) In November 2017, Tonti began discussing with Krueger possible employment at CKE. (*Id.* at 160:1–18.) On December 4, 2017 Tonti interviewed with Krueger and other management for a position at CKE and GourMED managing inventory, "purchasing, manufacturing, project planning and other related matters within operations and supply chain." (*Id.* 186:11–20.) Following the interview, CKE hired Tonti as its Director of Operations. (*Id.* at 186:4–9.) Tonti resigned from Cheryl & Co. on January 16, 2018 and worked her final day on January 30, 2018. (*Id.* at 18:1–3, 26:3–5.)

During her final two months at Cheryl & Co., Tonti forwarded several emails from her work account to her personal email inbox that are at issue in this case. Tonti forwarded three emails from her Cheryl & Co. email account to her personal email on December 4, 2017. (*See id.*, Exs. 83–85.) The three emails contained attached spreadsheets. (*Id.*) One spreadsheet contains

"information relating to Cheryl's actual and forecasted sales volume for 244 of Cheryl's products, including a large quantity of Cheryl's core cookies." (Eskridge Decl. ¶ 3; Tonti Dep, Ex. 84.) Another contains Cheryl & Co.'s "production schedule for fiscal weeks 22–25 in 2017." (Eskridge Decl. ¶ 4; Tonti Dep., Ex. 83.) The third is a spreadsheet that Cheryl & Co. characterizes as having "multiple tabs containing volumes of information revealing Cheryl's production for 2017 fiscal weeks 22–52 (Cheryl's busiest time of year), production forecasts into the end of 2018, corporate customer order information, sales information by cookie, date, and schedule, information relating to every single cookie that was produced by week including when it was produced and the amount produced of each type of cookie, and average cookie costs that can be used to determine profit margins." (Eskridge Decl. ¶ 5; Tonti Dep., Ex. 85.)

Tonti forwarded a fourth email from her Cheryl & Co. email to her personal email on January 30, 2018, her final day of employment, at 6:45 p.m. (Tonti Dep., Ex. 86.) This email contained a spreadsheet that Cheryl & Co. characterizes as containing "ingredients needed to produce several of Cheryl's products, including Cheryl's Chocolate Chip and Oatmeal Raisin cookies, two of Cheryl's best-selling products." (Eskridge Decl. ¶ 6.)

### 2. Defendant David Adell

David Adell began working for Cheryl & Co. in 1987. (Adell Dep. 57:20.) In 2003, Adell was promoted to Director of Food Production. (*Id.* at 57:4–7.) Adell oversaw roughly 200 employees in his role as Director of Food Production. (LaFollette Decl. ¶ 5.) His duties involved "managing Cheryl's entire production line from mixing of the raw dough, to baking, to frosting, to packaging the finished product for sale[.]" (*Id.*) In 2011, as consideration for continued employment, Adell signed a "Confidentiality and Non-Compete Agreement" with Cheryl & Co. identical to Tonti's agreement. (Adell Dep. 130:18–22, Ex. 105.)

Adell and Krueger have known each other for 40 years. (Krueger Dep. 322:14.) In the spring of 2018, Adell was aware that Tonti and Elisabeth Allwein had left Cheryl & Co. to work for Krueger's new business. (*Id.* at 324:15–21.) Frustrated with Cheryl & Co., he contacted Krueger to enquire about working for her. (*Id.*) CKE then hired Adell as its Manager of Warehouse, Food, and Gift Production. (Adell Dep. 74:13–15.) Adell resigned from his position at Cheryl & Co. on May 31, 2018 and began working at CKE in June. (*Id.* at 163:13–15.)

In May of 2018, prior to Adell's departure from Cheryl & Co., Adell engaged in communications with Elisabeth Allwein that are at issue in this litigation. At that time, Allwein had already begun working for CKE. (Allwein Dep. 100:13–14.) On May 1, Adell forwarded an email to Allwein that contained a solicitation from a business to buy "Pre-Owned Gemini Double Rack Gas Ovens." (Adell Dep., Ex. 17.) Prior to Adell forwarding Allwein this email, Allwein sought Adell's assistance about purchasing equipment "for work" because Adell was her "friend, and he knows about equipment." (Allwein Dep. ¶ 257:12–19, 261:1–6.) When he forwarded the email to Allwein, Adell believed she was working for "a medical marijuana processing company, and they might need used equipment." (Adell Dep. 217:4–7.) CKE did not purchase the ovens. (Allwein Dep. 261:11–13.) That same month, Allwein texted Adell about an online auction, asking him for his thoughts "on buying the excel packaging machine if we can get if for under $5k." (Adell Dep., Ex. 18.) Adell responded: "It looks like you can get one brand new in between 3,000 and 6,000 based off options. I'm trying to get a look at the one on auction but my job keeps getting in the way." (*Id.*) CKE did not participate in the auction or buy the packaging machine. (Allwein Dep. 264:22–33.)

### 3. Elisabeth Allwein

Elisabeth Allwein worked at Cheryl & Co. from 1993 to February of 2018. (*Id.* at 14:14–15.) Prior to her departure, Allwein worked as Cheryl & Co.'s Product Development Director. (*Id.* at 14:25.) She now works in an identical role at CKE. (*Id.* at 14:2–3.) Allwein did not sign a non-competition or confidentiality agreement with Cheryl & Co. (*Id.* at 85:21–86:4.)

### 4. Cindy Dalton

Cindy Dalton served as the Business Gift Services Account Manager at Cheryl & Co. from 1989 to August of 2018. (Am. Compl. ¶ 90; Answer ¶ 90.) Dalton was responsible for sales to Cheryl & Co.'s corporate customers and managed several high-grossing corporate accounts. (*See generally* Matthews Dep.) After leaving Cheryl & Co., she began working for CKE in the same role.

On July 16, 2018, prior to Dalton's resignation from Cheryl & Co., Dalton enquired about whether she had a non-compete with the company. (Killilea Dep., Ex. 18.) She sent Jane Killilea, a human resources manager at Cheryl & Co., an email asking to "check on" whether she had a non-compete because Dalton looked through her paperwork and could not find one. (Killilea Dep. 20:14–22, Ex. 18.) Killilea checked Dalton's employment file and did not find a non-competition agreement. (*Id.*) Killilea responded to Dalton's email on July 16, 2018, stating, "I did check with [Danette LaFollette, the VP of Human Resources] and she agreed that if it is not in your file, we do not have one." (*Id.*, Ex. 18.) In the summer of 2018 when Dalton and CKE were discussing her potential employment, Dalton informed CKE that she did not have a non-competition

agreement with Cheryl & Co. and showed CKE's Chief Operating Officer a photo of the email exchange with Killilea. (Martin Decl. ¶¶ 3–4, Ex. A.)

After Dalton began working for CKE and this litigation began, Cheryl & Co. discovered a document allegedly signed by Dalton in 1989 titled "Cheryl's Cookies, Inc. Confidentiality and Non-Competition Understanding." (LaFollette Dep., Ex. 138.) According to Danette LaFollette, Cheryl & Co.'s VP of Human Resources, an HR employee found it while shredding a box of old employment files. (*Id.* at 125:3–129:21.) The document contains the signature "Cindy Dalton" and is dated "5-1-89" with a blank witness line. (*Id.*) The parties dispute the legitimacy of this document.

Dalton also had emails in her personal inbox at issue in this litigation. Prior to her final day with Cheryl & Co., Dalton had IT forward several emails from her Cheryl & Co. inbox to her personal email inbox. (Matthews Decl. ¶ 4, Ex. H.) Altogether over 300 emails were forwarded. (*Id.* at Exs. A–H.) The emails were responses from Cheryl & Co.'s corporate customers to an email Dalton sent them letting them know that she "will be leaving [her] position" "after 30 years" at Cheryl & Co. (*Id.*) The messages from the corporate customers contained contact information in the form of the email addresses, names, and other information signature line of the corporate employee who replied to Dalton's email. (*Id.*)

### C. The Procedural History

Cheryl & Co. initiated this lawsuit in November of 2018. (Compl., ECF No. 1.) Cindy Dalton was originally named a Defendant in this action but passed away in 2019. (ECF No. 46.) Cheryl & Co. subsequently dropped Dalton from this action upon filing an Amended Complaint on December 12, 2019. (Am. Compl., ECF No. 104.) The facts surrounding her employment with CKE remain part of the Cheryl & Co.'s claims.

Counts I and II of the Amended Complaint assert claims for misappropriation of trade secrets against Defendants CKE and Tonti. Count III asserts a breach of contract claim against Defendant Krueger. Count IV asserts a claim for tortious interference with contractual and business relationships against Defendants CKE and Krueger. Count V asserts a breach of contract claim against Defendant Adell. Count VI asserts a breach of contract claim against Defendant Tonti. Count VII asserts a claim against Defendant Adell for breach of the duty of loyalty/faithless servant. And finally, Count VIII asserts a claim against Defendants CKE, Krueger, Tonti, Adell, and Allwein for civil conspiracy. After the parties had already filed their motions for summary judgment, this Court granted Defendant Allwein's motion to dismiss the civil conspiracy claim against her and terminated Allwein from this action. (ECF No. 146.) The Court also granted Cheryl & Co.'s motion to dismiss CKE's Amended Counterclaim for malicious litigation. (*Id.*)

The parties have each moved for summary judgment on several of the claims in the Amended Complaint, which are ripe for decision. (ECF Nos. 122–123.)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

"The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III. ANALYSIS

The parties have each moved for summary judgment on several claims. **First**, Plaintiff Cheryl & Co. and Defendants Tonti and Adell each move for summary judgment on Cheryl & Co.'s claim that Adell and Tonti breached their non-competition covenants. Cheryl & Co. also moves for summary judgment on its claim that Tonti breached a confidentiality provision of her agreement. **Second**, Defendants CKE and Tonti move for summary judgment on Cheryl & Co.'s claims for misappropriation of trade secrets. **Third**, Defendants CKE, Krueger, and Tonti move for summary judgment on all of Cheryl & Co.'s claims for tortious interference with contractual and business relationships; Cheryl & Co. moves for summary judgment only as to its claims for tortious interference with Tonti's and Adell's non-competition agreements. **Fourth**, Cheryl & Co. and Defendant Adell each move for summary judgment on Cheryl & Co.'s faithless servant claim. **Fifth**, all Defendants move for summary judgment on Cheryl & Co.'s civil conspiracy claims,

while Cheryl & Co. moves for summary judgment only as to the alleged conspiracy between Adell and Allwein. **Sixth** and finally, Cheryl & Co. moves for summary judgment on CKE's Amended Counterclaim for malicious litigation.

## A. Cheryl & Co.'s Breach of Contract Claims Against Defendants Tonti and Adell

Plaintiff Cheryl & Co. and Defendants Tonti and Adell have each moved for summary judgment on Cheryl & Co.'s breach of contract claims. Tonti and Adell each signed identical "Confidentiality and Non-Compete Agreement[s]" with Cheryl & Co. (Tonti Dep., Ex. 71; Adell Dep., Ex. 105.) Cheryl & Co. claims (1) that Tonti and Adell both breached the non-competition provisions of these agreements, and (2) that Tonti also breached a confidentiality provision of her agreement. Tonti and Adell are entitled to summary judgment as to the claims for breach of the non-competition agreements. Cheryl & Co. is entitled to summary judgment on its claim that Tonti breached a provision of her agreement requiring the return of materials at termination.

### 1. Tonti's and Adell's Alleged Breach of the Non-Competition Agreements

Cheryl & Co. argues that it is undisputed Tonti and Adell breached their non-competition agreements by working for CKE within one year of their employment at Cheryl & Co. Tonti and Adell argue that they did not breach any enforceable provisions of the non-compete. The Court agrees with Tonti and Adell.

Contract interpretation is a matter of law for the Court. *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007).[1] "Under New York law, 'covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood.'" *Kelley-Hilton v. Sterling Infosystems Inc.*, 426 F.

---

[1] The agreements at issue contain a New York choice-of-law provision. (Tonti Dep., Ex. 71, § 5.) Thus, New York law governs. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("When interpreting contracts in a diversity action, we also generally enforce the parties' contractual choice of governing law).

Supp. 3d 49, 57 (S.D.N.Y. 2019) (citing *Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 361 (N.Y. 2015)); *Henderson v. Patel*, 82 N.Y.S.3d 800, 803 (N.Y. Civ. Ct. 2018) ("[A] covenant not to compete must be strictly construed and should not be extended beyond the literal meaning of its terms.").

New York applies a three-pronged reasonableness test to determine the validity of employee agreements not to compete. A covenant not to compete will be enforced "to the extent that it is [1] reasonable in time and area, [2] necessary to protect the employer's legitimate interests," and "[3] not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (citation omitted).

In this case, the "Non-Competition/Non-Solicitation" provision in Section 2 of the agreements states that the employee "shall not" engage in any actions listed in Subsections 2.1(a), (b), or (c) during a period of "one (1) year following the cessation" of employment with Cheryl & Co. "within the United States[.]" (Tonti Dep., Ex. 71, § 2.1)[2] Subsection 2.1(a) states that the employee shall not: "Develop, market, sell or solicit to sell goods, or provide or perform services, similar to those goods and services that [the employee] developed, marketed, sold, solicited to sell, provided or performed while employed with the Company." (*Id.*) Subsections 2.1(b) and (c) prohibit the employee from "engag[ing] or participat[ing]" or "[b]ecom[ing] associated with" any "Competitive Business" as defined in the agreement. (*Id.*) The Court will analyze each of these in turn.

### a. Subsection 2.1(a) — Similar Goods or Similar Services

Cheryl & Co. argues that Tonti and Adell breached Subsection 2.1(a) because it is undisputed that within one year of their employment with Cheryl & Co. they "provide[d] or

---

[2] Tonti's and Adell's agreements are identical. (Tonti Dep., Ex. 71; Adell Dep., Ex. 105.) Thus, the Court will analyze the agreements together and cite only to Tonti's agreement for the sake of convenience.

perform[ed] similar services [to CKE], similar to those . . . [Tonti and Adell] provided or performed" while employed with Cheryl & Co. (ECF No. 122 at 25.) Adell and Tonti argue that Subsection 2.1(a) is unenforceable under New York law because it is overbroad and not tied to any legitimate business interest. (ECF No. 143-1 at 25.)[3] Tonti and Adell are correct; Subsection 2.1(a) is unenforceable as a matter of law.

Applying New York law, Subsection 2.1(a) is only enforceable if it is (1) reasonable in time and area, (2) no greater than necessary to protect Cheryl & Co.'s legitimate business interests, (3) and not harmful to the general public or unreasonably burdensome. *BDO Seidman*, 712 N.E.2d at 1223. Employers have legitimate business interests in: (a) preventing "an employee's solicitation or disclosure of trade secrets"; (b) preventing "an employee's release of confidential information regarding the employer's customers"; or (c) "in those cases where the employee's services to the employer are deemed special or unique." *Johnson Controls, Inc. v. A.P.T. Critical Sys.*, Inc., 323 F. Supp. 2d 525, 534 (S.D.N.Y. 2004). If "the non-compete agreement does not tie its restraint of the employee's activities to one of these three purposes, it is an unenforceable naked restraint on commerce." *Installed Bldg. Prod., LLC v. Cottrell*, No. 13-CV-1112-ASC, 2014 WL 3729369, at *7 (W.D.N.Y. July 25, 2014) (citing *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 369 N.E.2d 4, 6 (N.Y. 1977)).

Notwithstanding the agreement's time and area restrictions, the restrictions in Subsection 2.1(a) are much broader than necessary to protect any of Cheryl & Co.'s legitimate business interests. *BDO Seidman*, 712 N.E.2d at 1223 ("a restraint is reasonable only if it … is *no greater*

---

[3] Defendants submitted a Memorandum in Support of Defendants' Motion for Summary Judgment in ECF No. 123 and then later submitted a Corrected Memorandum in Support in ECF No. 143-1. Defendants submit that the Corrected Memorandum is identical to the original except that mistakes with the heading numbers were corrected. (ECF No. 143.) The Court will therefore cite to ECF No. 143-1 as Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment.

than is required for the protection of the *legitimate interest* of the employer[.]") (emphasis in original).  The provision contains limitations on both developing similar "goods" and providing similar "services."  The "services" limitation specifies that the employee shall not "provide or perform services, similar to those . . . services that [the employee] . . . provided or performed while employed with the Company."  (*Id.*)  Giving effect to the contract's plain meaning, it creates a naked restraint on an employee providing "similar" "services" anywhere in the United States as those services they provided at Cheryl & Co.  Such a restraint is far greater than is required to protect Cheryl & Co.'s legitimate business interests.

Consider the services Tonti and Adell "provided or performed" while employed with Cheryl & Co.  Cheryl & Co. describes Tonti's role as Director of Sourcing and Inventory Management as managing "the supply chain, including relationships with Cheryl's vendors, overs[eeing] the scheduling and purchase of raw materials for baking cookies, and assist[ing] with designing and fulfilling customer gift packages[.]"  (ECF No. 122 at 4.)  Suppose that Tonti had taken an identical job as the head of supply chain management at Coca Cola.  Her job duties would undoubtedly qualify as "similar" to the services she "provided or performed" at Cheryl & Co.  The same goes for Adell, who worked as Cheryl & Co.'s Director of Food Production.  (Adell Dep. 65:1–11.) Adell could "provide or perform" "similar" "services" overseeing food production for any food company in the United States and be in violation of Subsection 2.1(a).  But Cheryl & Co. could not—and does not—claim that it has a legitimate business interest in preventing its employees from providing or performing services outside of the cookie industry.  Yet that is what the plain meaning of the agreement forbids, and the Court must "strictly construe" the agreement. *Kelley-Hilton*, 426 F. Supp. 3d at 57.

Cheryl & Co. defends Subsection 2.1(a) by claiming that it is designed to prevent Tonti's

14

and Adell's "use and disclosure of Cheryl's confidential information." (ECF No. 134 at 22.) Subsection 2.1(a), however, contains no language tied to confidentiality. The broad language in Subsection 2.1(a) is like the covenant at issue in *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 369 N.E.2d 4, 6 (N.Y. 1977). In that case, the non-competition agreement stated that the employee, a salesperson, "will not, for a period of twenty-four months . . . sell or deliver any goods, wares, and merchandise of the kind or character sold by the Company at any time during the term of his employment[.]" *Id.* In declining to enforce this covenant, the court stated that "its broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness. It does no more than baldly restrain competition. This it may not do." *Id.* So too here. Subsection 2.1(a) is unrestrained by any "limitations keyed to uniqueness, confidentiality," or "competitive unfairness." *Id.*

Cheryl & Co.'s argument that Subsection 2.1(a) was designed to protect against the disclosure of confidential information is also foreclosed by the fact that Adell's and Tonti's agreements each contain a "Covenant Not to Divulge Confidential Information" in a different section of the agreement, (Tonti Dep., Ex. 71, § 1.2), which expressly protects against the disclosure of Cheryl & Co.'s confidential information. *Cf. Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 114 ("the contract should be construed so as to give full meaning and effect to all of its provisions") (citation omitted).

Cheryl & Co. also argues that Subsection 2.1(a) "logically applies only to [Cheryl & Co.'s] competitors like CKE, because those competitors would also develop, produce, market, and sell baked goods, including frosted cookies." (ECF No. 134 at 19–20.) But again, Subsection 2.1(a) contains no language limiting its reach to competitors. This omission stands in stark contrast to Subsections 2.1(b) and (c), which prohibit Adell and Tonti from "participat[ing], in any manner,

in" or "[b]ecom[ing] associated with" a "Competitive Business." (Tonti Dep., Ex. 71) That the parties included "Competitive Business" in Subsections 2.1(b) and (c), but chose not to include that term in Subsection 2.1(a), is persuasive textual evidence that 2.1(a) prohibits "similar" "services" provided or performed at any business, not just a business that qualifies as a "Competitive Business." *See Chesapeake Energy Corp.*, 773 F.3d at 114 ("[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract."). Even if this provision was ambiguous, the doctrine of contra proferentem dictates that the Court should construe it against Cheryl & Co. as the drafter of the agreement. *See Arbeeny v. Kennedy Exec. Search, Inc.*, 71 A.D.3d 177 (N.Y. Ct. App. 2010). Accordingly, Subsection 2.1(a) is overbroad and unenforceable as a matter of law.

### b. Subsections 2.1(b) and (c) — "Competitive Business"

Even though Subsection 2.1(a) of the agreement is unenforceable, New York law gives the Court discretion to sever that provision and enforce other provisions of the non-competition agreement. *See BDO Seidman*, 712 N.E.2d at 1226 ("The prevailing, modern view rejects a per se rule that invalidates entirely an overbroad employee agreement not to compete."). But if neither Adell nor Tonti breached these subsections, a severance analysis is unnecessary. Here, there was no breach of Subsections 2.1(b) or (c).

Whether Adell and Tonti violated Subsections 2.1(b) or (c) turns on whether CKE qualifies as a "Competitive Business." Subsection 2.1(b) states that an employee shall not "Engage or participate, in any manner, in a Competitive Business." (Tonti Dep., Ex. 71.) Subsection 2.1(c) states that an employee shall not "Become associated with . . . or become interested in . . . a Competitive Business." (*Id*.) "Competitive Business" is defined in Subsection 2.1(b) as:

> (i) any person or entity in the business **of manufacturing, marketing, distributing and/or selling cookies and baked goods through retail**

**stores, catalogs, mass marketing, wholesale, wholesale clubs, internet and telemarketing channels** which are the same as or substantially similar to the products or services offered for sale by the Company or any such products or services which the Company had developed or is actively developing at the time of cessation of EMPLOYEE's employment with the Company[;] and

(ii)      without limiting in any way the terms of 2.1(b)(i), those entities listed on Schedule "A" attached hereto and made a part hereof.

(*Id.* (emphasis added).) CKE is not an entity listed on Schedule A, which lists specific companies that are "Competitive Business[es]" in addition to the definition in Subsection 2.1(b)(i). (*Id.*) Therefore, to qualify as a "Competitive Business[,]" CKE must meet the specific definition provided in Subsection 2.1(b)(i).

Neither side disputes that CKE is "in the business of manufacturing, marketing, distributing and/or selling cookies and baked goods", but the parties diverge in their interpretations of the subsequent language—"selling cookies and baked goods through retail stores, catalogs, mass marketing, wholesale, wholesale clubs, internet **and** telemarketing channels." (*Id.* (emphasis added).) CKE argues that the use of the conjunction "and" in the list of business channels means that, to qualify as a "Competitive Business[,]" CKE must do business through **each** of the seven enumerated channels. (ECF No. 143-1 at 27.) And because it is undisputed that CKE does not do business through wholesale clubs, (Krueger Decl. ¶ 8), CKE does not qualify as a "Competitive Business." (ECF No 143-1 at 27.) Cheryl & Co. counters, asserting that a "common sense reading of the non-competition agreements is that they must be interpreted so as to prevent unfair competition with Cheryl's competitors—not just those that check all seven boxes." (ECF No. 134 at 29.) Cheryl & Co. argues that it was "clearly the intent of the parties that selling products in 'wholesale clubs' was not required to fit within the definition of a 'Competitive Business.'" (*Id.* at 30.) The plain language of the agreement shows otherwise.

"[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp.* 773 F.3d at 114. Further, "words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* The law is clear that the word "and" used in a list of conditions means that those conditions are conjunctive. *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 542 N.E.2d 1048, 1050 (N.Y. 1989) ("the discharge, dispersal, release or escape must be 'sudden and accidental'. Since the exception is expressed in the conjunctive, both requirements must be met for the exception to become operative.'"); *Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n*, 165 F. Supp. 3d 80, 97 (S.D.N.Y. 2016) ("The inclusion of the word 'or' would plainly indicate the subsections are alternatives; the inclusion of the word 'and,' that they are integrated. Here, the final two subparagraphs are separated by the word 'and.' Thus, the no-action clause is constructed to require the completion of all indicated steps."); *Cf. Bonner v. Guerrieri*, 2009 N.Y. Slip Op. 52666(U), 2009 WL 5183777, at *2 (interpreting use of the word "or" in a list of conditions and holding that the "contractual language is unambiguously disjunctive, not conjunctive.").

The language here is unambiguous. "Reading 'and' to mean 'or' would 'violate a basic principle of contract interpretation.'" *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *10 (Bankr. S.D.N.Y. Aug. 6, 2018). A "Competitive Business" is one "manufacturing, marketing, distributing **and/or** selling cookies and baked goods through retail stores, catalogs, mass marketing, wholesale, wholesale clubs, internet **and** telemarketing channels . . . ." (Tonti Dep., Ex. 71 (emphasis added)). The word "and" denotes a conjunctive list. As CKE rightly points out, the drafters used the conjunction "and/or" in the same sentence immediately prior to the list of the seven required business channels. That the drafters used "and/or" in the

same sentence, yet still chose to only use "and" in the list of channels, makes it inescapable that the parties intended "and" to mean "and." To meet the definition of a "Competitive Business" then, a company must do business through each of the seven channels enumerated (or be specifically named in Schedule A attached to the agreement). It is undisputed that CKE does not do business through wholesale clubs. (Krueger Decl. ¶ 8.) Thus, CKE is not a "Competitive Business" and is not covered by Subsections 2.1(b) or (c).

Cheryl & Co. emphasizes Krueger's admission that CKE is a direct competitor of Cheryl & Co. (*See* Krueger Dep. 282:6–283:5.) It also claims that some of the entities listed in Schedule A do not sell its products in wholesale clubs. (ECF No. 134 at 30.) It thus argues that it was "clearly the intent of the parties that selling products in 'wholesale clubs' was not required to fit within [the] definition of a 'Competitive Business.'" (*Id.*) But when, as here, the language is unambiguous, "intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp.* 773 F.3d at 114. Cheryl & Co.'s contradictory extrinsic evidence of intent cannot override the four corners of the unambiguous contract.

The contract enumerates a list of requirements a business must meet to be a "Competitive Business" unless the business is specifically named in Schedule A. Selling products in "wholesale clubs" is one of those requirements. CKE does not do business in wholesale clubs and is not listed in Schedule A. Therefore, CKE is not a "Competitive Business." And because CKE is not a "Competitive Business[,]" neither Tonti nor Adell breached Subsections 2.1(b) or (c).

### c. Modification of the Non-Compete

Cheryl & Co. urges the Court to modify the non-competition covenant if the Court holds that it is unenforceable as written. (*See* ECF No. 134 at 19.) New York law gives courts discretion to partially enforce or modify covenants not to compete. *BDO Seidman*, 712 N.E.2d at 1226.

Partial enforcement of a non-compete may be justified when the unenforceable portion is not an "essential part of the agreed exchange" and "if the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct," and shows that it in good faith sought to "protect a legitimate business interest, consistent with reasonable standards of fair dealing[.]" *Id.*

Whether an overbroad restrictive covenant should be modified is a "case specific analysis, focusing on the conduct of the employer in imposing the terms of the agreement." *Id.* Factors weighing against partial enforcement are the "imposition of the covenant in connection with hiring or continued employment—as opposed to, for example, imposition in connection with a promotion to a position of responsibility and trust—the existence of coercion[,]" "and the employer's knowledge that the covenant was overly broad." *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 9 A.D.3d 805, 807 (N.Y. Ct. App. 2004) (citing *BDO Seidman*, 712 N.E.2d at 1226). Similarly, courts will not modify a restrictive covenant where modification would amount to redrafting the parties' contract. *See, e.g.*, *Elexco Land Servs., Inc. v. Hennig*, No. 11-CV-214, 2012 WL 5288760, at *3 (W.D.N.Y. Oct. 23, 2012) ("even if Plaintiff could demonstrate the requisite good faith, this Court would still decline to partially enforce the agreement, since blue penciling the restrictive covenant in question would require the Court to essentially redraft the parties' contract."); *Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 107 (2d Cir. 2017) ("Crye argues that the district court could have further defined color palette, pattern, and arrangement. But these terms are the essence of the clause; none can be severed to permit partial enforcement.").

In this case, several factors weigh against modifying the agreement. First, modification here would amount to re-drafting a specific definition in the contract. The only modification

Cheryl & Co. proposes is for the Court to modify the agreement "to apply only to Cheryl's competitors, which CKE indisputably is." (ECF No. 134 at 19.) But the contract already provides a precise definition of who qualifies as a competitor. Rewriting the definition of "Competitive Business" to include CKE in Subsections 2.1(b) and (c) would expand that definition. The Court declines to redraft a defined term to make it more expansive.

Second, Cheryl & Co. has also failed to demonstrate the absence of overreaching. *See BDO Seidman*, 712 N.E.2d at 1226. Cheryl & Co. has legitimate business interests in preventing unfair competition and protecting its proprietary information. The agreements have provisions tied to those interests: Section 1.2 contains a "Covenant Not to Divulge Confidential Information" and Subsections 2.1(b) and (c) prohibit employees from working for a "Competitive Business." (Tonti Dep., Ex. 71, §§ 1.2, 2.1.) But Cheryl & Co. also included Subsection 2.1(a), a provision textually unrestrained by any legitimate business interest with far-reaching restrictions. Any modification of Section 2.1(a) would reward Cheryl & Co. for including a clearly overbroad provision. *See BDO Seidman*, 712 N.E.2d at 1226 ("A legitimate consideration against [partial enforcement] is the fear that employers will use their superior bargaining position to impose unreasonable anti-competitive restrictions, uninhibited by the risk that a court will void the entire agreement, leaving the employee free of any restraint.").

Third, the non-competes are form agreements that Tonti and Adell signed only in consideration of further employment. (Tonti Dep at 12:2–12, Ex. 71; Adell Dep. 130:18–22, Ex. 105); *Skavina*, 9 A.D.3d 805 at 807–08 (declining to modify overbroad non-compete where there was "no showing that, in exchange for her signing the agreement, defendant enjoyed a fiduciary relationship, a position of increased responsibility within the firm or any other significant benefit beyond continued employment.").

Accordingly, Tonti and Adell have not breached their non-competition agreements. Subsection 2.1(a) is overbroad and unenforceable. Furthermore, there is no factual dispute that Tonti and Adell did not breach Subsections 2.1(b) or (c) because, as a matter of law, CKE is not a "Competitive Business" as defined in the agreements, and the Court declines to re-draft this definition. Therefore, the Court **GRANTS** Adell's motion summary judgment on Cheryl & Co.'s breach of contract claim and **DENIES** Cheryl & Co.'s motion. The Court **GRANTS** Tonti's motion for summary judgment as to Cheryl & Co.'s claims for breach of her non-compete and **DENIES** Cheryl & Co.'s motion for the same.[4]

### 2. Tonti's Breach of Her Confidentiality Agreement

Cheryl & Co. moves for summary judgment on its breach of contract claim against Tonti for her alleged breach of the confidentiality provisions in her agreement. (ECF No. 122 at 25.) Specifically, Cheryl & Co. argues that Tonti breached her agreement by retaining materials after termination in breach of Section 1.3. (ECF No. 142 at 5.)

Section 1.3 of Tonti's agreement is titled "Return of Materials at Termination." (Tonti Dep., Ex. 71, § 1.3.) It provides that, in "the event of any termination," the employee "will promptly deliver to Company all material, property, documents, data, and other information belonging to Company or the group or pertaining to Confidential Information." (*Id.*) It also specifies that the employee "shall not take or retain any materials, property, documents, or other information, or any reproduction or excerpt thereof, belonging to the Company or the Group or containing or pertaining to any Confidential Information." (*Id.*)

It is undisputed that Tonti retained "materials, property, documents, or other information

---

[4] Defendants also argue that Cheryl & Co.'s failure to seek a preliminary injunction prevents Cheryl & Co. from obtaining the permanent injunctive relief and damages it seeks. (ECF No. 143-1 at 18.) The Court expresses no opinion on this argument because the Court concludes that Tonti and Adell did not breach their non-competition agreements.

. . . belonging" to Cheryl & Co. (Tonti Dep. at 100:13–103:9, 113:12–116:20, 144:9–17, Exs. 83–86.) Tonti forwarded three emails from her Cheryl & Co. account to her personal email on December 4, 2017. She forwarded a fourth email on January 30, 2018, her final day of employment. (*See id.*, Exs. 83–85.) The emails contained spreadsheets of Cheryl & Co.'s sales forecasts, production schedules, production forecasts, and ingredient lists for several cookie recipes. (Eskridge Decl. ¶ 3–6; Tonti Dep, Exs. 83–86.). These emails remained in Tonti's personal inbox well after her final day of employment because Tonti produced the emails from her inbox during discovery in this case. It is also undisputed that these documents meet the definition of "Confidential Information"[5] as defined in Section 1.1. Furthermore, there is no dispute that Tonti failed to "promptly deliver" to Cheryl & Co. all materials belonging to Cheryl & Co. following the end of her employment. Tonti therefore breached Subsection 1.3. (Tonti Dep., Ex. 71, § 1.3.)

Tonti's arguments to the contrary are unconvincing. Tonti argues that (a) the definition of "Confidential Information" is indefinite and therefore unenforceable; (b) that there is a dispute of fact regarding whether Cheryl & Co. waived Tonti's duty under Section 1.3; and (c) that the phrase

---

[5] The agreement defines "Confidential Information" as:

"As used herein, the term 'Confidential Information' means all information relating to the Group and any of the Group's customers, operations, products, sales, finances, trade secrets, and business, including without limitation any information encompassed in any reports, investigations, customer and recipient lists (whether or not written) and customer and recipient information, business plans and business relationships, information on suppliers, vendors and fulfilling florists, experiments, research or developmental work, experimental work, work in progress, drawings, designs, plans, proposals, codes, marketing and sales programs, financial projections, financial data including sales and pricing information and all other financial data, cost summaries, pricing formula and trademarks, service marks, and all concepts or idea materials or information, owned possessed or controlled or related to the business of the Group, regardless of whether same may be possessed or developed by EMPLOYEE in the course of his employment or otherwise. Confidential Information also includes, without limitation, all information EMPLOYEE receives from third parties in the course of EMPLOYEE'S employment which is provided to EMPLOYEE in connection with EMPLOYEE'S duties for the Company and the Group. EMPLOYEE acknowledges and agrees that any and all Confidential Information of the Group learned by EMPLOYEE during the course of employment by Company or otherwise, whether developed by EMPLOYEE alone or in conjunction with others or otherwise, shall be and is the sole property of Company." (Tonti Dep., Ex 71, § 1.1.)

"promptly deliver" used in Section 1.3 is ambiguous. Tonti also points out that Cheryl & Co. has not argued that it suffered any damages resulting from a breach of Section 1.3.

### a. Definiteness

Tonti first argues that Cheryl & Co. is not entitled to summary judgment because it has not established that the provisions at issue are "definite and susceptible to enforcement." (ECF No. 135 at 30.) Tonti argues that the definition of "Confidential Information" is "indefinite in scope" because it includes "all information relating to the Group", which does not exclude information publicly available ("Group" refers to Cheryl & Co. and any other company under the 1-800 Flowers umbrella).

A contract must be sufficiently definite in its material terms to be enforceable. *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 105 (N.Y. 1991). "The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." *Id.* "Striking down a contract as indefinite and in essence meaningless 'is at best a last resort.'" *Id.* at 106 (citation omitted).

Tonti's agreement is sufficiently definite. That "Confidential Information" is defined broadly does not make it vague or indefinite. (Tonti Dep., Ex. 71, § 1.1.) Furthermore, even if the definition of "Confidential Information" was indefinite, Section 1.3 makes clear that the employee "shall not take or retain any materials, property, documents or other information . . . belonging to the Company or the Group[,]" whether or not those materials were "Confidential Information." (*Id.*)

### b. Waiver

Tonti next argues that there is a genuine dispute of fact regarding whether Cheryl & Co.

"waived the applicable provisions of Ms. Tonti's agreement." (ECF No. 135 at 30–31.) After she tendered her resignation, Tonti claims that she worked closely with Cheryl & Co.'s human resources department and Chief Operating Officer, but "no one told [her] to check that [she] had no Cheryl's documents" in her possession, despite Cheryl & Co.'s knowledge that she routinely worked from home and travelled between different Cheryl & Co. locations. (Feb. 14, 2020 Tonti Decl. ¶ 5.)

As a threshold matter, Cheryl & Co. responds that the agreement contains a no-waiver clause. However, Cheryl & Co's argument is mistaken. Section 6 of Tonti's agreement states: "No amendment or modification of the terms or conditions of this Agreement shall be valid unless in writing and signed by the parties hereto[.]" (Tonti Dep., Ex. 71, § 6.) The clause therefore prohibits **amendments** and **modifications** unless in writing and signed by the parties. But the clause says nothing of **waiver**. "There is a distinction between a modification agreement and a waiver. A modification agreement 'is binding according to its terms and may only be withdrawn by agreement.'" *O'Connor v. Curcio*, 281 A.D.2d 100, 102 (N.Y. Ct. App. 2001) (citing *Nassau Tr. Co. v. Montrose Concrete Prod. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982)). In contrast, a waiver "requires no more than the voluntary and intentional abandonment of a known right[.]" *Nassau Tr. Co.*, 436 N.E.2d at 1269. Because the clause only refers to "amendments" and "modifications" but does not refer to "waiver," it is not a no-waiver clause.

Waiver requires "an intentional relinquishment of a known right and should not be lightly presumed." *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 824 (S.D.N.Y. 2016) (citation omitted). Intention to waive a contractual right "must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Id.* (citation omitted). "Mere silence or oversight does not constitute clear manifestation of an intent to relinquish a

known right." *Matthew Adam Props., Inc. v. The United House of Prayer for All People of the Church on the Rock of the Apostolic Faith*, 126 A.D.3d 599, 601 (N.Y. Ct. App. 2015). In some situations, waiver may be established through "failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006). Generally, the "existence of an intent to forgo such a right is a question of fact." *Id.*

Although intent to waive is generally a question of fact, no reasonable juror could find that Cheryl & Co. waived its right to enforce Section 1.3. The only fact Tonti points to as evidence of waiver is that "no one told" her she needed to check that she had no Cheryl & Co. documents in her possession prior to the end of her employment. (Tonti Decl. ¶ 5.) But a party to a contract is not required to remind the other side of its obligations if it wishes to retain the right to enforce those obligations. *See Fin. Servs. Vehicle Tr. v. Saad*, 98 A.D.3d 1077, 1078 (N.Y. Ct. App. 2012) ("[a] party is under an obligation to read a document before signing it, and cannot generally avoid the effect of the document on the ground that he or she did not read it or know its contents."). Moreover, Cheryl & Co.'s "[m]ere silence" does not "constitute a clear manifestation of an intent to relinquish" its right to enforce Section 1.3 of Tonti's agreement. *Matthew Adam Properties, Inc.*, 126 A.D.3d at 601; *see also Echostar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 618 (N.Y. Ct. App. 2010) ("Disney's failure to press for interest amounts to mere silence or inaction, which are insufficient to establish an intent to waive a known right.").

If anything, Cheryl & Co.'s affirmative acts demonstrate the opposite of an intent to waive any of Tonti's contractual duties. After Cheryl & Co. learned of Tonti's employment at CKE, Cheryl & Co.'s parent company sent Tonti a notice letter which stated: "Please be on notice that should the Company be compelled to enforce our rights due to your non-compliance and breach

26

or your obligations of confidentiality, we shall vigorously seek all equitable and legal remedies . . . ." (Tonti Dep., Ex. 96.)  There is no evidence in the record from which a reasonable juror could find that Cheryl & Co. waived this provision of Tonti's agreement.

### c. Ambiguity of the duty "promptly deliver"

Next, Tonti argues that the agreement is "ambiguous on its face as to when the duty to "promptly deliver" arises.  (ECF No. 135 at 31.)  The Court disagrees.  The agreement provides that the "promptly deliver" arises "[i]n the event of any termination of [the employee's] employment[.]"  (Tonti Dep., Ex. 71, § 1.3.)  It is a conditional duty that arises when "any termination" of the employee's employment occurs.  And there is no genuine dispute that Tonti failed to "promptly deliver" the "materials, property, documents, data and other information belonging to" Cheryl & Co. following her termination.  (*Id.* at 100:13–103:9, 113:12–116:20, 144:9–17, Exs. 71, 83–86.)

### d. Nominal Damages

Finally, Tonti argues that even if summary judgment is warranted against her, the Court should not award damages based on her breach of Section 1.3 because Cheryl & Co. has not asserted that it was damaged by any breach of Tonti retaining materials after termination. However, in New York, nominal damages are always available in breach of contract actions. *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993).  A party is entitled only to nominal damages to vindicate a breach of contract if the party fails "to submit sufficient evidence to demonstrate actual damages as a result of the" breach. *Ross v. Sherman*, 95 A.D.3d 1100, 1100 (N.Y. Ct. App. 2012). The damages Cheryl & Co. contends it sustained result from Tonti's alleged breach of other provisions of the agreement; Cheryl & Co. has submitted no evidence that it was damaged as a result of Tonti merely possessing Cheryl & Co.'s documents following her termination.  Cheryl &

Co. is therefore only entitled to an award of nominal damages for Tonti's breach of Section 1.3.

Accordingly, the Court **GRANTS** summary judgment to Cheryl & Co. on its claim that Tonti breached Section 1.3 of her agreement.

## B. Defendants CKE and Tonti's Motion for Summary Judgement on Cheryl & Co.'s Claims for Misappropriation of Trade Secrets

Defendants CKE and Tonti move for summary judgment on Cheryl & Co.'s claims for misappropriation of trade secrets. (ECF No. 143-1 at 30.) Cheryl & Co. has asserted two claims for misappropriation of trade secrets—one state and one federal. (*See* Am. Compl. Counts I–II, ¶¶ 116–144.) Cheryl & Co. alleges that CKE and Tonti misappropriated trade secrets that include "customer lists and customer information, production schedules, production forecasts, purchasing forecasts, sales data, financial information and profit margins, the method of operation and process for making and frosting its cookies." (*Id.* ¶¶ 117, 132.)

Both federal and Ohio law prohibit the misappropriation of trade secrets. *See* 18 U.S.C. § 1839; Ohio Rev. Code § 1333.61. "Misappropriation" means, in relevant part: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who":

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
>> (I) derived from or through a person who had used improper means to acquire the trade secret; . . . .

18 U.S.C. § 1839(5); Ohio Rev. Code § 1333.61(B) (identical definition). A "trade secret" is "all forms and types of financial, business, scientific, technical, economic, or engineering information . . ." if:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C § 1839(3); *see also* Ohio Rev. Code § 1333.61(D) (similar definition). To succeed on a misappropriation claim, the plaintiff must show that: (1) a trade secret exists; (2) the defendants acquired the trade secret through improper means (or knew or had reason to know it was acquired improperly); and (3) the defendants used the trade secret without authorization. *Premier Dealer Serv., Inc. v. Allegiance Administrators, LLC*, No. 2:18-CV-735, 2018 WL 5801283, at *4 (S.D. Ohio Nov. 6, 2018) (citation omitted) (analyzing misappropriation claim under Ohio law).

In response to CKE and Tonti's motion for summary judgment, Cheryl & Co. argues that genuine issues of fact preclude summary judgment on the following alleged trade secrets: (1) emails forwarded from Cindy Dalton's Cheryl & Co. email account to her personal email which show contact information for many of Cheryl & Co.'s corporate customers; (2) the four emails Tonti forwarded from her Cheryl & Co. account to her personal email, discussed *supra*, containing spreadsheets of Cheryl & Co.'s business information; and (3) Cheryl & Co.'s confidential production processes. (ECF No. 134 at 40–42.) CKE and Tonti are entitled to summary judgment on Cheryl & Co.'s claims related to Dalton's emails, but genuine issues of fact preclude summary judgment on the remaining trade secrets.

### 1. Cindy Dalton Emails Containing Customer Contact Information

Regarding Dalton's emails, CKE focuses its summary judgment motion only on the final element of a misappropriation claim—whether CKE "used the trade secret without authorization." *Premier Dealer Serv., Inc.*, 2018 WL 5801283, at *4. If CKE did not use the trade secret information in Dalton's emails to solicit Cheryl & Co. customers, as Cheryl & Co. claims, Cheryl

& Co.'s misappropriation claim fails. Cheryl & Co. argues that there are genuine issues of fact on whether CKE used the customer contact information from Dalton's emails to solicit five of Cheryl & Co.'s customers—Chase Bank, Bath & Body Works, White Castle, Corna Kokosing, and Wisys. (ECF No. 134 at 37; Expert Report of Stephen Buffo, ¶ 29.) The Court, however, concludes that there is no evidence in the record that CKE ever used this customer contact information to solicit these customers.

CKE through its corporate representative, Chief Operating Officer William Martin, testified that Chase Bank, Bath & Body Works, White Castle, and Corna Kokosing each initiated contact with CKE to purchase its products. (Martin Dep. 57:10–22 (Chase Bank), 58:13–24 (Bath & Body Works), 60:21–24 (Corna Kokosing), 64:11–19 (White Castle); Martin Decl. ¶ 7.) Regarding the fifth customer—Wisys—"CKE's first contact with Wisys occurred in late June of 2019, several weeks after Ms. Dalton passed." (Martin Decl. ¶ 8.) CKE also instructed Dalton that she "was not permitted to contact the corporate customers with which she had dealt at Cheryl's[.]" (*Id.* ¶ 6.) Furthermore, there is no evidence that Dalton provided CKE with Cheryl & Co.'s customer contact information, nor is there evidence that Dalton identified Chery & Co.'s customers for CKE. (*Id.* ¶ 9.)

Cheryl & Co. attempts to demonstrate a factual dispute through circumstantial evidence. (ECF No. 134 at 36.) First, it lost these customers to CKE after Dalton started working there. (Martin Dep. 31:9–20, 32:14–17, 57:10–16, 60:21–61:10, 64:8–65:21.) Second, two of those customers—White Castle and Corna Kokosing—appear in the batch of 300 emails forwarded to Dalton's personal email. (Matthews Decl., Exs. C, F.) Third, in CKE's internal emails discussing Bath & Body Works, Martin touted the "emotional edge versus our competition because of their relationship with [Dalton]." (Martin Dep., Ex. 48.) Fourth, CKE solicited two smaller customers

of Cheryl & Co.'s. (Martin Dep. 63:3–64:5.) Finally, Cheryl & Co. points to internal CKE emails that it claims show Dalton worked with CKE to develop customer marketing materials, that Dalton was projected to be CKE's top sales representative, and that Dalton was compensated more than CKE's president. (*See* Musekamp Decl., Exs. A–H; Avery Dep. 164:15–20.) Relying on these facts, Cheryl & Co. argues that a jury could infer that Dalton had a motive to use the contact information to solicit customers and that, because these customers purchased from CKE after Dalton began working there, a jury could infer that CKE solicited these customers using Cheryl & Co.'s trade secret information. (ECF No. 134 at 37–38.)

Cheryl & Co.'s circumstantial evidence falls short. None of the facts on which Cheryl & Co. relies disputes CKE's evidence that it did not use Dalton's emails to solicit Cheryl & Co. customers. Cheryl & Co. has uncovered no evidence that CKE **solicited** Chase Bank, Bath & Body Works, White Castle, Corna Kokosing, or Wisys—let alone evidence that CKE **used** the contact information from Dalton's emails to solicit them. Indeed, the emails forwarded to Dalton's personal account contain no correspondence with Chase Bank, Bath & Body Works, or Wisys. (Matthews Decl., Exs. A–D.) As for Corna Kokosing and White Castle, it is undisputed that each of those businesses contacted CKE, not the other way around. (Martin Dep. at 60:21–61:7, 64:6–17.) Furthermore, CKE provided the names of the persons from Corna Kokosing and White Castle who contacted them. (Martin Dep. 61:1–4, 64:17.) Cheryl & Co.'s circumstantial evidence does not dispute CKE's testimony. While it is true that CKE assigned its Bath & Body Works account to Dalton, the only evidence in the record shows that it did so only after Bath & Body works called CKE's call center, and that Bath & Body Works did not call in for anyone specifically. (*Id.* at 58:13–24.) Lastly, though CKE solicited two of Cheryl & Co.'s smaller customers, it is undisputed that these businesses did not end up ordering from CKE (Martin Dep. 63:3–12.)

Relying on *Novus Grp., LLC v. Prudential Fin., Inc.*, No. 2:19-CV-208, 2019 WL 4452708, *8 (S.D. Ohio Sept. 17, 2019), Cheryl & Co. argues that "a plaintiff must often rely on circumstantial evidence when prosecuting a trade secret claim[.]" It is true that "misappropriation and misuse can rarely be proved by convincing direct evidence" and that circumstantial evidence is permissible. *Id.* at *8. (citing *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005)) (internal quotations omitted). However, the Court in *Novus* relied on precedent involving evidence of similar design between a plaintiff's product and a defendant's subsequent product to support an inference that trade secret information must have been used to create the subsequent product. *See, e.g.*, *Stratienko* 429 F.3d at 600; *Wilson v. Hasbro, Inc.*, No. 3:05-CV-457R, 2009 WL 860355, at *7 (W.D. Ky. Mar. 30, 2009). Similarity of design is not the issue here. In any event, the more fundamental problem for Cheryl & Co.'s circumstantial evidence is that it fails to dispute CKE's evidence that it did not solicit these customers. Without disputing CKE's evidence, Cheryl & Co.'s theory amounts to speculation. Cheryl & Co. also speculates as to Dalton's motive, stating that "there is no plausible explanation for Ms. Dalton sending herself those emails other than for use at CKE." (ECF No. 134 at 38.) Speculation, however, "will not suffice to defeat a motion for summary judgment." *Griffin v. Jones*, 170 F. Supp. 3d 956, 963 (W.D. Ky. 2016).

Because Cheryl & Co. has not demonstrated a genuine factual dispute for trial, the Court **GRANTS** CKE's motion for summary judgment as to Cheryl & Co.'s misappropriation claims related to CKE's alleged use of customer information acquired by Dalton.

### 2. Documents Attached to Tonti's Emails

Cheryl & Co. claims that Tonti and CKE misappropriated trade-secret documents attached to the December 4, 2017 and January 30, 2018 emails Tonti forwarded to her personal inbox while still at Cheryl & Co. Tonti does not dispute that she forwarded emails from her Cheryl & Co.

account to her personal account containing attached spreadsheets showing sales forecasts, production forecasts, and ingredients needed to make certain cookies. (Tonti Dep. at 100:13–103:9, 113:12–116:20, 144:9–17, Exs. 83–86; Eskridge Decl. ¶¶ 3–6.)

Regarding these emails, Tonti and CKE move for summary judgment on the same ground as for Dalton's emails: that they did not use the information contained in Tonti's emails. (ECF No. 143-1 at 31–32.) Cheryl & Co. responds that: (1) Tonti's mere forwarding of the emails amounts to misappropriation by acquisition; and that (2) "there is a question of fact as to whether Defendant CKE and Defendant Tonti used" the trade secret information. (ECF No. 134 at 40.)

### a. Misappropriation by Acquisition

Cheryl & Co. argues that, at the very least, Tonti forwarding this information to her personal email account amounts to misappropriation by acquisition. *See* 18 U.S.C. § 1839(5)(A) (misappropriation by acquisition). However, Tonti rightly points out that Cheryl & Co. has not advanced any damages theory based only on Tonti's acquisition of its trade secrets. Cheryl & Co. only seeks damages in the amount of lost profits from the five former customers that took their business to CKE. (*See* Expert Report of Stephen Buffo.) To recover on that theory, Cheryl & Co. must prove that its trade secrets were used or disclosed. Cheryl & Co. has not pointed to any evidence that Tonti's mere acquisition of the emails caused these customers to order from CKE and cause Cheryl & Co. to lose profits. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2018 WL 466510, at *3 (N.D. Cal. Jan. 18, 2018) (explaining that the jury will not be instructed on acquisition-only damages because "the only discernible damages theories preserved by Waymo have been grounded in defendants' alleged use or disclosure of trade secrets. These theories reference acquisition only insofar as it forms a logical prerequisite to use or disclosure.").

Accordingly, because Cheryl & Co. has pointed to no evidence that it suffered damages solely from Tonti's acquisition of its trade secrets, its misappropriation claim cannot survive on an acquisition-only theory.

### b. Misappropriation by Use

Next, Tonti and CKE argue that it is undisputed that Tonti did not use the trade secret information contained in the December 4, 2017 and January 30, 2018 emails. Tonti denies ever showing the spreadsheets attached to these emails to anyone outside of Cheryl & Co. and her attorneys. (Tonti Dep. at 113:6–8, 143:14–16, 165:1–20.) She also claims that she did not know these emails were in her inbox until she was asked to search her inbox during discovery for this litigation. (*Id.* at 112:5–17.) Cheryl & Co. responds and again turns to circumstantial evidence. (ECF No. 134 at 40.) Cheryl & Co. challenges Tonti's credibility and argues that the jury must be permitted to weigh the circumstantial evidence and assess Tonti's credibility. (*Id.* at 41.) The Court agrees with Cheryl & Co.

The timing of the emails is significant. Tonti interviewed with CKE on December 4, 2017, the same day she forwarded three of the four emails at issue. (Tonti Dep. 160:11–18.) During her deposition she could not recall why she forwarded those emails to her personal inbox. (*Id.* at 116:9–13, 117:11–14.) Tonti sent the final email on January 30, 2018—her last day at Cheryl & Co.—at 6:45 p.m. (*Id.* at 26:3–5, Ex. 86.) The document attached to the January 30, 2018 email displays quantities of ingredients needed to product some of Cheryl & Co.'s "best-selling" cookies. (Eskridge Decl. ¶ 6.) Tonti claims that she forwarded the January 30, 2018 email to her personal account because someone at a 1-800-Flowers sister company asked her to potentially "assist and do some consulting after [Tonti] left Cheryl's because [Tonti] seemed to know the system of Oracle [a system Cheryl & Co. was implementing at the time] and understand the data[.]" (*Id.* at

146:8–13.) But Tonti could not recall that person's name. (*Id.* at 146:18.)

Furthermore, looking at these documents attached to the emails in the light most favorable to Cheryl & Co., they contain "confidential information that could be used to start a successful cookie company and eliminate the need for significant research and development." (Eskridge Decl. ¶ 2.) Considering the apparent value of this information together with the suspicious timing of the emails and Tonti's lack of explanation for the December 4, 2017 emails, Tonti's credibility is at issue. And, unlike on the claim regarding Dalton's emails, Tonti has not pointed to evidence outside of her own denials that she never used the information in these emails. Thus, this claim turns on Tonti's credibility. And because "summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's" witness, *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013), the Court cannot resolve this claim on summary judgment.

Accordingly, the Court **DENIES** CKE and Tonti's motion for summary judgment as to Cheryl & Co.'s misappropriation claim regarding the December 4, 2017 and January 30, 2018 emails.[6]

### 3. Cheryl & Co.'s Production Techniques

Lastly, Tonti and CKE move for summary judgment on Cheryl & Co.'s claims for misappropriation of Cheryl & Co.'s trade-secret production process and techniques. (ECF No. 143-1 at 32.) Specifically, Tonti and CKE argue that Cheryl & Co. cannot premise a trade secret claim on production processes that are depicted in a video Cheryl & Co. published on its website titled "A Cookie's Journey." (*Id.* at 32, 33; Tonti Decl. ¶¶ 3–10.) In response, Cheryl & Co.

---

[6] Tonti also moves for summary judgment on Cheryl & Co.'s misappropriation claim relating to a "fiscal calendar" that Tonti emailed from her work account to her personal account. (ECF No. 143-1 at 30.) Cheryl & Co. responds that Tonti's argument is moot because it has not asserted a misappropriation claim based on a fiscal calendar. (ECF No. 134 at 35.) Thus, Cheryl & Co. waives any misappropriation claim based on Tonti's fiscal calendar.

argues that the video is a mere "ten-thousand-foot summary" of the baking process and does not reveal any trade secret production processes. (ECF No. 134 at 9–10, 43; Druckman Dep. 66:17–73:12.) Cheryl & Co. submits that the video "does not show specifications such as ingredients, temperatures, or quantities necessary to replicate Cheryl's production techniques." (*See id.*)

"Whether information qualifies as a trade secret is ordinarily 'a question of fact to be determined by the trier of fact upon the greater weight of the evidence.'" *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002) (quoting *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 707 N.E.2d 853 (1999) (syllabus)). A trade secret is shown by evidence "demonstrating the extent to which the information is known outside the business and the precautions that Plaintiff has taken to guard the secret nature of the information." *Id.* (citing *Ne. Ohio College of Massotherapy v. Burek*, 759 N.E.2d 869 (2001)). Tonti and CKE claim that, by publishing various steps of its cookie-making process on video, Cheryl & Co. has failed to take "reasonable measures to keep such information secret" and that their production techniques are therefore not trade secrets. (ECF No. 143-1 at 36 (citing 18 U.S.C. § 1839(A); Ohio Rev. Code § 1333.61(D)(2).) However, Cheryl & Co. comes forward with ample evidence that the video does not reveal the trade-secret processes or techniques on which its claims are based. (Druckman Dep. 66:17–73:12.) Whether Cheryl & Co.'s production processes are a trade secret is a question of fact that must be resolved by a jury. *See DeBoer Structures (U.S.A.) Inc.*, 233 F. Supp. 2d at 948. The video is but one piece of evidence the jury may consider.

Accordingly, the Court **DENIES** Tonti and CKE's motion for summary judgment on Cheryl & Co.'s misappropriation claims regarding Cheryl & Co.'s production processes and techniques.

## C. Tortious Interference with Contractual and Business Relationships Claims

Count IV of the Amended Complaint alleges against Defendants CKE and Krueger: (1) tortious interference with Tonti's and Adell's non-competition agreements; (2) tortious interference with Dalton's non-competition agreement; and (3) tortious interference with Cheryl & Co.'s customer relationships. (Am. Compl. ¶¶ 153–164.) CKE and Krueger have moved for summary judgment on each of these claims. Cheryl & Co. moves for summary judgment only as to its tortious interference with contract claim as to Tonti and Adell.

### 1. Tortious Interference with Contract Claims

Cheryl & Co. claims that Krueger and CKE wrongfully induced Tonti, Adell, and Dalton to breach their non-competition agreements with Cheryl & Co. In Ohio, the "elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). It is axiomatic that, in order to succeed on tortious interference with contract claim, the plaintiff must prove the existence of a "valid and enforceable contract[.]" *T-Star Int'l, Inc. v. Kirby Co.*, No. 1:07 CV 1003, 2008 WL 11383293, at *12 (N.D. Ohio Sept. 30, 2008) (citing *Bell v. Horton*, 680 N.E.2d 1272 (Ohio Ct. App. 1996)). "One cannot interfere with an unenforceable agreement." *Id.* (citation omitted). Here, CKE and Krueger are entitled to summary judgment because (a) Adell and Tonti did not breach their non-competes and (b) no jury could find that CKE or Krueger had knowledge of Dalton's alleged non-compete.

### a. Tonti's and Adell's Non-Competes

Regarding Tonti and Adell, Cheryl & Co.'s tortious interference claim fails as a matter of law because Cheryl & Co cannot show the existence of a valid contract or a breach of contract.

As discussed, *supra*, Subsection 2.1(a) of Tonti's and Adell's non-competition agreements are unenforceable. And neither of them breached Subsections 2.1(b) or (c). Thus, the Court **GRANTS** Krueger and CKE's motion for summary judgment on Cheryl & Co.'s claim for tortious interference with Tonti's and Adell's non-competition agreements and **DENIES** Cheryl & Co.'s motion.

### b. Dalton's Non-Compete

The facts differ regarding Dalton because she did not sign the same non-compete that Tonti and Adell did. (*See* LaFollette Dep., Ex. 138.) The parties' arguments focus on the first two elements of a tortious interference claim: (1) the existence of a contract and (2) the wrongdoer's knowledge of the contract. *Fred Siegel Co., L.P.A.*, 707 N.E.2d at 858.

Starting with the first element—the existence of a contract—the parties contest whether Dalton ever signed a non-compete with Cheryl & Co. Cheryl & Co. bases its tortious interference claim on a document titled "Cheryl's Cookies, Inc. Confidentiality and Non-Competition Understanding" signed by "Cindy Dalton" and dated "5-1-89". (LaFollette Dep., Ex. 138.) Krueger and CKE claim that Dalton never signed this document. (ECF No. 143-1 at 37.) CKE and Krueger present testimony from a handwriting expert who opines that the signatures on the non-compete "were probably not written by the same person who wrote the known signatures of Cindy Dalton." (Songer Decl. ¶ 4.) The Defendants also point to the blank "witness" line as further evidence that Dalton did not sign the agreement. (LaFollette Dep., Ex. 138.) However, weighing expert testimony and determining whether Dalton's signature is legitimate or a forgery is a question of fact for a jury. Thus, summary judgment on this element is not appropriate.

Next, Krueger and CKE argue that Cheryl & Co. has no evidence to satisfy the second element of its tortious interference claim: that the alleged wrongdoers had knowledge of the

contract.  (ECF No. 143-1 at 37.)  Krueger and CKE point to evidence that: (1) Krueger states that she had no knowledge the 1989 agreement existed until it was produced during this litigation (Krueger Decl. ¶ 10); (2) Cheryl & Co. told Dalton on July 16, 2018 that she did not have a non-compete in her employment file (Killilea Dep. 19:21–25:12, Ex. 18.); and (3) Dalton relayed to CKE Cheryl & Co.'s statement that she did not have a non-compete (Martin Decl. ¶¶ 4–5).

In response, Cheryl & Co. points to evidence that: (1) the Dalton agreement was executed while Krueger was operating Cheryl & Co. in 1989 and, at that time, it was Krueger's regular business practice to have employees sign non-competes (Krueger Dep. 32:2–21); and (2) that Danette LaFollette, Cheryl & Co.'s VP of Human Resources, informed Dalton during her exit interview on August 21, 2018 that she had a non-compete in place. (LaFollette Dep. 139:23–140:18, Ex. 10.)  To survive summary judgment on the second element, Cheryl & Co.'s evidence need only be sufficient to "support a 'reasonable inference' that"  Krueger and CKE had actual knowledge of Dalton's non-compete.  *Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*, 202 F. App'x 108, 112 (6th Cir. 2006).  Cheryl & Co.'s evidence does not satisfy this burden.

First, Cheryl & Co.'s argument omits material information from Krueger's deposition testimony.  During her deposition, when presented with a non-compete that David Adell signed in 1987, Krueger testified that it was a business practice for "production people" to sign non-competes.  (Krueger Dep. 32:2–21.)  Cindy Dalton, however, did not work in production.  Cindy Dalton worked in sales.  (Krueger Decl. ¶ 12.)  Cheryl & Co. asked Krueger about sales positions:

> "Q. Okay. At that point in time, is it your understanding that people who worked in sales at Cheryl's Cookies did not sign confidentiality and noncompetition understandings?
>
> A. No.  Why?  No.  I mean, why would they?"

(Krueger Dep. 27:17–21.)  Krueger went on to state: "So [Adell] was one of the first people to sign

it in '87 because he had access to the recipe. People who had access to the recipe signed it, that was it. That's all we felt was necessary." (*Id.* at 28:10–13.) Krueger's deposition testimony is consistent with her declaration that, in "1989, it would have been inconsistent with Cheryl's company policy for an employee who did not have access to Cheryl's cookies recipes, such as Ms. Dalton who was hired as a salesperson, to be asked to sign the non-competition understanding." (Krueger Decl. ¶ 12.) Thus, there is no evidence that Krueger had knowledge of the agreement from her time as company owner.

Second, there is no evidence that Dalton—or even Cheryl & Co. itself—was aware of the alleged 1989 non-compete prior to Dalton joining CKE. If neither Cheryl & Co. nor Dalton knew of the agreement, Krueger and CKE certainly did not know of the agreement. In July of 2018, Cheryl & Co. informed Dalton that she did not have a non-compete in her in file and that "if it is not in your file, we do not have one." (Killilea Dep. 20:14–22, Ex. 18.) Cheryl & Co. did not discover the 1989 document until well after this litigation began. (LaFollette Dep. 125:3–129:21.)

Cheryl & Co. claims that LaFollette informed Dalton during her exit interview that she was subject to a non-compete. (ECF No. 134 at 46.) But this argument, too, omits key information from LaFollette's testimony. During Dalton's exit interview on August 21, 2018, Dalton informed LaFollette that she was considering "working for Cheryl Krueger." (LaFollette Dep. 140:11–12.) LaFollette then "reminded [Dalton] that that would not be a good decision on her part because she has a non-compete." (*Id.* at 140:12–15.) However, LaFollette was not referring to the 1989 agreement—she stated that she "didn't know of that document **until well after this exit interview**." (*Id.* at 140:16–21(emphasis added).) Rather, LaFollette was referring to the company's non-competition agreement that was "electronically distributed [to employees] in the 2009 to 2011 time frame[,]" "assuming that . . . [Dalton] would have had [one] in her file because

of the requirements for that level and that position . . . ." (*Id.* at 140:23–141:7.) Thus, LaFollette's statement to Dalton about being subject to a non-compete was based on LaFollette's incorrect assumption that Dalton had signed a non-compete sometime in 2009–2011. There is no evidence that Dalton signed a non-competition agreement in the 2009–2011 period. (*Id.* at 142:16–143:7.)

In the end, Cheryl & Co. has produced no evidence that Krueger or CKE knew of the 1989 agreement before Dalton began working for CKE. Therefore, Cheryl & Co.'s claim for tortious interference with Dalton's non-compete fails as a matter of law because Cheryl & Co. cannot prove that the alleged wrongdoers had actual knowledge of the contract. *See Fred Siegel Co., L.P.A.*, 707 N.E.2d at 858. Accordingly, the Court **GRANTS** Krueger and CKE's motion for summary judgment on this claim.

### 2. Tortious Interference with Business Relationships Claim

Krueger and CKE move for summary judgment on Cheryl & Co.'s claim that they tortiously interfered with Cheryl & Co.'s customer relationships. Krueger and CKE argue that the record shows that CKE did not solicit any of the Cheryl & Co. customers on which Cheryl & Co. bases its lost-profits damages. (ECF No. 143-1 at 38.) Krueger and CKE submit that each of those customers contacted CKE to order cookies, and that there is nothing improper about taking orders from customers who reached out to them for business. (*Id.*)

Cheryl & Co. argues that "there is sufficient circumstantial evidence to create a genuine issue of material fact as to whether Defendants interfered with Cheryl's customer relationships with Chase Bank, Bath & Body Works, White Castle, Corna Kokosing, and Wisys." (ECF No 134 at 49.) Cheryl & Co. further argues that "Defendant Tonti and Ms. Dalton also took critical proprietary information from Cheryl's that could be used for no reason other than to operate a competing cookie company, which necessarily includes the solicitation of Cheryl's customers."

(*Id.* at 49–50.)  On this claim, however, Cheryl & Co.'s circumstantial evidence is not sufficient to survive summary judgment.

In Ohio, the "elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Geo-Pro Serv., Inc. v. Solar Testing Lab'ys, Inc.*, 763 N.E.2d 664, 672 (Ohio Ct. App. 2001) (citation omitted).  The intentional interference must be improper.  *Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 413 (Ohio Ct. App. 1999).

Here, there is no evidence that CKE improperly interfered with Cheryl & Co.'s relationships with the five customers Cheryl & Co. identifies.  As the Court discussed at length in Part III.B.1, *supra*, Cheryl & Co. has pointed to no evidence that CKE solicited Chase Bank, Bath & Body Works, White Castle, Corna Kokosing, or Wisys.  Likewise, Cheryl & Co. has no evidence that CKE taking orders from these companies was improper in any way.  It is undisputed that those five companies each initiated contact with CKE enquiring about their baked goods.  (Martin Decl. ¶¶ 7–8.)  Furthermore, Cheryl & Co. identifies nothing in the record that shows Krueger and CKE had knowledge of Cheryl & Co.'s relationship with these five companies.

Therefore, because the undisputed evidence shows that CKE did not improperly interfere with Cheryl & Co.'s business relationships, the Court **GRANTS** Krueger and CKE's motion for summary judgment on this claim.

### D.  Cheryl & Co.'s Faithless Servant Claim Against Defendant Adell

Count VII of the Amended Complaint alleges that Adell breached the duty of loyalty and acted as a faithless servant while employed with Cheryl & Co.  (Am. Compl. ¶¶ 177–180.)  Cheryl & Co. and Adell have both moved for summary judgment on this claim.

Under Ohio common law, "an employee owes a duty to act in 'the utmost good faith and loyalty toward his employer.'" *Orbit Elecs., Inc. v. Helm Instrument Co.*, 855 N.E.2d 91, 100 (Ohio Ct. App. 2006) (citing *Connelly v. Balkwill*, 116 N.E.2d 701 (Ohio 1954)). The duty of loyalty is based on an implied condition of employment that an employee will "act in good faith and not act to the detriment" of the employer. *Roberto v. Brown Cnty. Gen. Hosp.*, 571 N.E.2d 467, 469 (Ohio Ct. App. 1989). An employer may sue an employee who breaches the duty of loyalty. *Orbit Elecs., Inc.*, 855 N.E.2d at 100.

As a subset of a claim for breach of the duty of loyalty, Ohio appellate courts have recognized the "faithless servant" doctrine. *Roberto*, 571 N.E.2d at 469 (adopting the faithless servant doctrine as enunciated by the Kansas Supreme Court in *Bessman v. Bessman* 520 P.2d 1210 (Kan. 1974)). Under the faithless servant doctrine, "dishonesty and disloyalty on the part of an employee which **permeates** his service to his employer will deprive him of his entire agreed compensation, due to the failure of such an employee to give the stipulated consideration for the agreed compensation." *Id.* (emphasis added). In other words, if dishonesty or disloyalty "permeates" the employee's service, the employee can be required to "forgo his compensation during such period of 'faithlessness.'" *Id.* In *Roberto*, the court applied the faithless servant doctrine in the case of a hospital administrator who embezzled $54,000 from the hospital. *Id.* Finding the administrator's conduct "ongoing and pervasive[,]" the court affirmed the denial of his request to be awarded deferred compensation that he "earned" during the period of faithlessness. *Id.*; *cf. Bush v. Signals Power & Grounding Specialists*, Inc., 2009-Ohio-5095, ¶ 27 ("even if we were to [ ] adopt the faithless servant doctrine, appellee's acts of removing or destroying his computerized library was an abrupt act performed at the end of his service to the company, unlike the employee in *Roberto*, who had embezzled funds over time and was also

convicted of a criminal offense.").

Here, Cheryl & Co. alleges that Adell—while still employed at Cheryl & Co—acted as a faithless servant when he corresponded with Elisabeth Allwein on two occasions about Allwein purchasing equipment for use at CKE. (ECF No. 122 at 30–32.) It is undisputed that after Allwein left Cheryl & Co. to work for CKE, Allwein sought Adell's assistance about purchasing equipment because Adell was her friend. (Allwein Dep. ¶ 257:12–19, 261:1–6.) On May 1, 2018, Adell forwarded an email to Allwein that contained a solicitation from a business to buy pre-owned ovens. (Adell Dep., Ex. 17.) Later that month, Allwein texted Adell about an online auction, asking him for his thoughts on buying a packaging machine. (Adell Dep., Ex. 18.) Adell responded: "It looks like you can get one brand new in between 3,000 and 6,000 based off options. I'm trying to get a look at the one on auction but my job keeps getting in the way." (*Id.*) CKE did not participate in the auction or buy the packaging machine. (Allwein Dep. 264:22–33.) Relying on the faithless servant doctrine, Cheryl & Co. seeks to recover compensation paid to Adell from May 1, 2018 (the day he forwarded Allwein the email about pre-owned ovens) through June 14, 2018 (his final day of employment). (*Id.* at 32; Adell Dep. 243:19–20; Am. Compl. ¶ 180.) Cheryl & Co. argues that Adell's correspondence with Allwein was disloyal and that he "intentionally acted contrary to the best interests of" Cheryl & Co. (ECF No. 122 at 31.)

Even if a jury found that Adell's two communications with Allwein were disloyal, no jury could find that these communications evidence "dishonesty and disloyalty" that "permeate[d] his service" from May 1, 2018 through June 14, 2018. *Roberto*, 571 N.E.2d at 469. Cheryl & Co.'s evidence of disloyalty is insufficient as a matter of law to rise to meet the faithless servant standard. Citing to New York law, Cheryl & Co. claims that Adell forfeited all compensation "after his first faithless act." *In re Blumenthal*, 32 A.D.3d 767, 768 (N.Y. Ct. App. 2006). But that case found

"repeated disloyalty throughout [the employee's] entire tenure," which involved making several unauthorized transfers from a decedent's estate to pay himself. *Id.* It is also not Ohio law. Adell forwarding Allwein one email and responding to one text message—neither of which caused any damage to Cheryl & Co., or even any gain to CKE—cannot be described as the "ongoing and pervasive conduct" of a "wayward and unruly agent" like that of an employee who embezzles money from his employer, *Roberto*, 571 N.E.2d at 469, or siphons money from an estate, *In re Blumenthal*, 32 A.D.3d at 768. *See also AK Steel Corp. v. Earley*, 809 F. Supp. 2d 1326, 1340–41 (S.D. Ala. 2011) (applying Ohio's faithless servant doctrine and holding that "even if [the employer] had made a sufficient showing that Defendants were disloyal, the evidence before the Court does not indicate that such disloyalty 'permeated' Defendants' service.")

Because Cheryl & Co.'s evidence is insufficient to show that disloyalty permeated Adell's service, its faithless servant claim cannot withstand summary judgment. Thus, the Court **GRANTS** Adell's motion for summary judgment on Count VII of the Amended Complaint and **DENIES** Cheryl & Co.'s motion.

### E.  Cheryl & Co.'s Civil Conspiracy Claims Against all Defendants

The parties next movie for summary judgment on Cheryl & Co.'s claims for civil conspiracy against all Defendants in Count VIII of the Amended Complaint. (Am Compl. ¶¶ 181–189.) It alleges two conspiracies: one between Defendant Adell and Elisabeth Allwein; another conspiracy between Defendants CKE, Krueger, Adell, and Tonti. (*Id.*) Cheryl & Co. only moves for summary judgment as to the alleged conspiracy between Adell and Allwein. (ECF No. 122 at 322.) Defendants move for summary judgment as to both alleged conspiracies. After the parties moved for summary judgment, the Court dismissed Cheryl & Co.'s civil conspiracy claim as to the alleged conspiracy between Adell and Allwein. (*See* ECF No. 146.) Thus, the motions for

summary judgment on the alleged conspiracy between Adell and Allwein are moot.

"The elements of a civil conspiracy claim are: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 326 (S.D. Ohio 2007) (citing *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993) (internal quotations omitted)). "An underlying unlawful act or tort is required before a party can prevail on a civil conspiracy claim." *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 825 (S.D. Ohio 2007) (citing *Dickerson Internationale, Inc. v. Klockner*, 743 N.E.2d 984 (Ohio Ct. App. 2000)).

Defendants argue that Cheryl & Co.'s civil conspiracy claim is barred by the intra-corporate conspiracy doctrine. (ECF No. 143-1 at 39–40.) Under this doctrine, "a corporation cannot conspire with its own agents or employees." *Cap City Dental Lab, LLC v. Ladd*, No. 2:15-CV-2407, 2016 WL 4573993, at *7 (S.D. Ohio Sept. 1, 2016). As the Sixth Circuit put it when discussing the federal doctrine, it "is the basic law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991) (citing *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)).

Cheryl & Co. responds that the doctrine only applies when the alleged co-conspirators commit the underlying tortious acts while employed by the same corporate defendant. (ECF No. 134 at 51.) And because Tonti and Adell were employed with Cheryl & Co.—not CKE—during their alleged underlying tortious acts, the intra-corporate conspiracy doctrine does not bar the civil

46

conspiracy claim. (*Id.*) Put differently, Cheryl & Co. argues that the conspiracy was formed prior to the Defendants merging into a single entity because the unlawful acts underlying the civil conspiracy claims were committed by Tonti and Adell while still employed at Cheryl & Co.

The question here is whether the elements of a civil conspiracy claim were satisfied prior to Defendants all becoming agents of CKE. If the elements were satisfied only after the Defendants became agents of CKE, the intra-corporate conspiracy doctrine applies and bars the claim against Defendants. If the elements were satisfied when at least one of the Defendants was not yet an agent of CKE, the intra-corporate conspiracy doctrine would not bar the claim against Defendants. To answer this question, then, the Court must look to the underlying alleged unlawful acts on which the civil conspiracy claim depends.

Cheryl & Co. submits that the acts underlying its civil conspiracy claim are: (a) Tonti's alleged misappropriation of trade secrets; (b) Adell's breach of the duty of loyalty by communicating with Allwein; and (c) CKE and Krueger's tortious interference with Adell's and Tonti's non-competition agreements. (ECF No. 134 at 52.) But, because the Court granted summary judgment to Defendants on Cheryl & Co.'s duty of loyalty and tortious interference claims, *see supra,* only Tonti's alleged misappropriation of trade secrets can form the basis of the civil conspiracy claim here. *See Mender v. Chauncey*, 41 N.E.3d 1289, 1301 (Ohio Ct. App. 2015) ("A civil action for civil conspiracy requires a viable claim distinct from the conspiracy in order for the conspiracy claim to survive.").

Relying on Tonti's alleged misappropriation of trade secrets, the injury to property and the underlying tortious act could not have occurred until after Tonti became an agent of CKE. As the Court explained in Part III.B.2.b, *supra*, Cheryl & Co.'s misappropriation of trade secrets claim can only succeed if a jury finds that Tonti used—rather than merely acquired—Cheryl & Co.'s

trade secrets to cause damage to Cheryl & Co. The only "injury" Cheryl & Co. asserts flowing from Tonti's misappropriation are damages from the lost profits of customers who took their business to CKE after Tonti began working for CKE (CKE did not even open for business until roughly eight months after Tonti joined the company). Thus, the elements of Cheryl & Co.'s civil conspiracy claim could not have been satisfied until after Defendants CKE, Krueger, and Tonti were all agents of CKE. And there is no evidence that Adell was involved with Tonti's alleged misappropriation of trade secrets prior to becoming an agent of CKE. Therefore., Cheryl & Co.'s remaining civil conspiracy claim against Defendants CKE, Krueger, Tonti, and Adell is barred by the intra-corporate conspiracy doctrine. *Cap City Dental Lab, LLC*, 2016 WL 4573993, at *7.

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to the alleged conspiracy between Defendants CKE, Krueger, Tonti, and Adell. The Court **DENIES AS MOOT** the parties' motions for summary judgment as to the alleged conspiracy between Adell and Allwein.

### F. CKE's Amended Counterclaim for Malicious Litigation

Lastly, Cheryl & Co. moves for summary judgment on CKE's counterclaim for malicious litigation. (ECF No. 122 at 33.) After the parties moved for summary judgment, the Court granted Cheryl & Co.'s motion to dismiss this claim. (ECF No. 146.) The Court therefore **DENIES AS MOOT** Cheryl & Co.'s motion for summary judgment on this claim.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS in part**, **DENIES in part,** and **DENIES AS MOOT in part** Plaintiff Cheryl & Co.'s Motion for Summary Judgment. (ECF No. 122.) The Court **GRANTS in part, DENIES in part,** and **DENIES AS MOOT in part** Defendants' Motion

for Summary Judgment.  (ECF No. 123.)  The Clerk is **DIRECTED** to terminate Defendant David

Adell from this action.  This case is to remain open.

      **IT IS SO ORDERED.**

**4/28/2021**                                     **s/Edmund A. Sargus, Jr.**
**DATE**                                                 **EDMUND A. SARGUS, JR.**
                                                 **UNITED STATES DISTRICT JUDGE**